**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

DONNA L. REILLY,

        Plaintiff,

v.                                          Case No. 3:04-cv-1320-J-32MMH

DUVAL COUNTY PUBLIC SCHOOLS,

        Defendant.

_____

## ORDER[1]

    This case is before the Court on Defendant Duval County Public Schools'

Motion for Summary Judgment (Doc. 46) and Daubert Motion to Exclude Jerry Albert,

a Certified Vocational Evaluation Specialist (Doc. 47).  Plaintiff responded to the

motion for summary judgment (Doc. 54) and the Daubert motion (Doc. 60).

## I.    PROCEDURAL HISTORY AND BACKGROUND

### A.    Procedural History

    On December 24, 2004, plaintiff, Donna Reilly ("Reilly"), filed suit against the

Duval County School Board ("defendant") alleging that defendant: (1) discriminated

against her based on her age in violation of the Age Discrimination in Employment Act

("ADEA"), 29 U.S.C. § 621, et seq., and the Florida Civil Rights Act ("FCRA"), Fla.

_____

    [1]   Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically.  However, it has been entered only to decide the motion or matter addressed herein and is not intended for official publication or to serve as precedent.

Case 3:04-cv-01320-TJC-MCR   Document 65   Filed 10/31/06   Page 2 of 24 PageID 1372

Stat. §§ 760.01-760.11, (2) retaliated against her in violation of the FCRA[2] and (3) violated her rights under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140.  On September 15, 2006, per the parties' stipulation, the undersigned dismissed the ERISA claim (Count III) with prejudice.  (Doc. 58).  The remaining claims are the age discrimination claims under the ADEA and FCRA (Counts I and II) and the retaliation claim under the FCRA (Count II).  Defendant seeks summary judgment on these claims.

### B.    Background Facts

Reilly is a 69 year old female who began working for the Duval County School District (the "district") in 1965 as a substitute teacher.  (Doc. 46, Ex. 1, Reilly Dep. at pp. 8-9).  Reilly earned a Bachelor of Arts from Long Island University in 1958 and a Master's Degree in Counseling from Jacksonville University in 1983.  (Id. at p. 7). Prior to 1995, Reilly held multiple teaching positions in Duval County and multiple counseling positions outside of the Duval County School System.  (Id. at pp. 8-33). In 1995, Reilly began working as a guidance counselor at Paxon Middle School.  (Id. at p. 33-34).  Reilly held that position when she entered Florida's Deferred Retirement Option Program ("DROP") in 1998.  (Id. at p. 88).

DROP, which is governed by Fla. Stat. § 121.091(13), is a program under which a member of the Florida Retirement System can defer retirement benefits while

_____

[2]    In the Verified Complaint, Reilly alleges retaliation only under the FCRA.  (Doc. 1).

-2-

continuing to work with a Florida Retirement System employer for a period of five years.  Fla. Stat. § 121.091(13).  The employee's deferred retirement benefits that accrue while participating in the DROP system are invested in an annuity with a certain guaranteed return rate.  Id.  Because Reilly entered DROP on October 1, 1998, her DROP participation expired on September 30, 2003 and she would be required to retire at that time.  (Doc. 46, Ex. 1, Reilly Dep. at Ex. 1; Doc. 46, Ex. 2, Reynolds Dec. at ¶ 5).

In March or April of 2000, while working at Paxon Middle School, Reilly sought a transfer to Fort Caroline Middle School to work as a guidance counselor.  (Doc. 46, Ex. 1, Reilly Dep. at p. 39).  Reilly interviewed with the then Principal of Fort Caroline, Joe Fowler; it is unclear, however, whether there was actually a position available at the time Reilly interviewed with Fowler.  (Id. at p. 40).  Thereafter, a district administrator telephoned Reilly and inquired whether she was still interested in the guidance counselor position; the administrator told Reilly that Fowler would no longer be the Principal at Fort Caroline and that Kathy Kassees would be taking his place beginning the 2000-2001 school year.  (Id. at p. 41).  The district administratively placed Reilly in the guidance position at Fort Caroline.  (Id.).  After being placed in the position, Reilly visited Principal Kassees at the school to introduce herself prior to the start of the school year.  (Id. at p. 42).  The meeting was not a formal interview.  (Id.).

Reilly served as the head guidance counselor for the following three school years at Fort Caroline.  During her tenure, Reilly worked directly under Principal

Kassees and with fellow guidance counselor, Tom Mezzano.  (Id. at p. 43).  Reilly also worked with the clerical staff in the guidance office.  (Id. at p. 47).  This included Velda Woodard (in charge of office records) and Mary Turner (handled student records and coordinated parent meetings for the first two years of Reilly's tenure at Fort Caroline).  (Id. at pp. 47-49).  During her deposition, Reilly was unsure of whether she technically supervised the clerical staff in the guidance office and ultimately testified that she believed Principal Kassees supervised them.  (Id. at pp. 50-51).

Reilly's duties as the head guidance counselor were to provide overall counseling to the Fort Caroline students, help oversee the guidance department, handle school registration procedures, meet with parents and serve as the testing administrator for the Florida Comprehensive Aptitude Test (FCAT) and other standardized testing.  (Id. at pp. 43-45).  As the testing administrator, Reilly was in charge of all testing logistics and details, including test booklets, handling and collecting answer sheets and the general administration of the standardized tests. (Id.).  The testing administration required Reilly to attend training classes.  (Id.).

Principal Kassees performed Reilly's performance evaluation each of the three years that Reilly worked at Fort Caroline.  On March 15, 2001, Principal Kassees rated Reilly as satisfactory in every category in the evaluation.[3]  The categories include "Shows sensitivity to student needs by maintaining a positive school

---

[3]   There are only two ratings for each category in the 2001, 2002 and 2003 evaluations: Satisfactory and Unsatisfactory.

environment," "Communicates with parents," "Promotes student growth and performance," and "Demonstrates professional behaviors." (Doc. 54-4, Kassees Dep. at Ex. 7).  The 2001 evaluation contains comments such as "Does an excellent job," "Always very positive and sensitive to student needs," "Communicates daily with parents," and "Highly professional.  A valued member of the Ft. Caroline staff."  (Id.).

On March 11, 2002, Principal Kassees rated Reilly as satisfactory in every category, including "Shows sensitivity to student needs by maintaining a positive school climate," "Demonstrates ability to communicate effectively with parents, students, teachers, and administrators," "Demonstrates willingness to assume general professional responsibilities," (Principal Kassees wrote "test coordinator" in the comments section next to that category) and "Shows evidence of professional characteristics."  (Id.).  Again on March 14, 2003, Principal Kassees rated Reilly as satisfactory in every category (the categories are the exact same as those in the 2002 evaluation).  (Id.).  Principal Kassees also noted that "Mrs. Reilly is a top-notch test coordinator.  She supports Ft. Caroline as a valued team member."  (Id.).

Reilly testified in her deposition that she approached Principal Kassees in January or February 2003, which was after the legislature passed a law providing that a teacher could retire under DROP for a month only and then come back to work. (Doc. 46, Ex. 1, Reilly Dep. at pp. 92-93).  During that meeting, Reilly asserts that after she informed Principal Kassees that she would like to continue working, the following exchange occurred:

Reilly: Well, I'd like to continue working.

Principal Kassees: When is your DROP date?  (After figuring out the DROP date of September 30, 2003) No.  It's time for you to retire.  You need rest.  You've worked long enough.  Stay home and travel with Gene (Reilly's husband).  You've been working a long time.  It's time for you to stay home.

Reilly: I don't want to stay home.

Principal Kassees: Well, I'm concerned with your health.

Reilly: What about my health?  There's nothing wrong with my health.

Principal Kassees: Now.

Reilly: I don't understand.  I really would like to continue working.

(Id.).  Reilly further states that she reiterated her wish to continue working during her evaluation in March 2003 and Principal Kassees again told her that she had worked long enough and that she should stay home and rest.  (Id. at pp. 95-96).

Defendant, whose position is that these conversations never occurred, points out in its motion for summary judgment that the change in the DROP statute allowing re-employment of a retired teacher as "instructional personnel" did not occur until June 2003.  (Doc. 46, Defs. MFSJ at p. 8 n. 1; Doc. 46, Ex. 3, Kassees Decl. at ¶ 32); Fla. Stat. § 121.091(9)(b)(3).[4]  Principal Kassees further asserts that the first time she

---

[4]    The Governor signed this change into law on June 26, 2003 and rendered it effective as of June 1, 2003.  See Laws 2003, c. 2003-260, §§ 9 to 11.  Other changes to the DROP statute, now codified at Fla. Stat. § 121.091(13) (which allow DROP participants to participate beyond the initial 60 month DROP period for up to a maximum period of 96 months if the participant receives annual authorization from his or her school principal and the Superintendent) were signed into law on June 9, 2003 and rendered effective as of June 1, 2003.  See Laws 2003, c. 2003-391, § 8.

ever spoke with Reilly about re-employment with the district or extending her DROP

period was in July 2003.  (Doc. 46, Ex. 3, Kassees Decl. at ¶ 32).

On June 6, 2003, defendant and the Duval Teachers United ("DTU") signed a

"Memorandum Of Understanding" ("MOU") that memorialized their interpretation of

the Florida Legislature's extension of the DROP Program.  (Doc. 54-3, Kassees Dep.,

Ex. 5).  The MOU provides:

> With regard to the extension of DROP, employees may be extended
> pursuant to the provisions of Florida Statute 121.091 and under the
> following conditions:
>
> 1.     It is ultimately the Superintendent's decision whether or not the
>        extension is granted for each employee, but he will not consider
>        an extension unless the Supervisor/Principal recommends
>        approval first.
>
> 2.     If recommending a classroom teacher, Supervisor/Principal should
>        recommend approval of extensions be granted to those who:
>
>            Demonstrate effectiveness in the classroom;
>
>            Work to support the mission of the school; and
>
>            Provide opportunities for student academic growth.

(Id.).  On June 11, 2003, Assistant Superintendent for Human Resources, Vicki

Reynolds, issued a memorandum explaining the changes in the DROP statute and

quoting from the MOU as the criteria for Principals to use when determining whether

to extend DROP service.[5]  (Id. at Ex. 6).

_____

[5]     While the MOU provides that this criteria applies to a "classroom teacher," the
Reynolds memorandum sent to all principals recapitulates this criteria and provides
that the criteria is to be applied to "employees" eligible for DROP extensions.  (Doc.

On July 10, 2003, Reilly again approached Principal Kassees about extending her DROP service. (Doc. 46, Ex. 1, Reilly Dep. at pp. 97-102).  Reilly's husband, Eugene Reilly, accompanied her to this meeting.  (Id.).  At the beginning of the meeting, Reilly handed Principal Kassees a letter dated July 10, 2003 that essentially stated she was aware of the changes in the DROP statute and requested to continue as the guidance counselor for the 2003-2004 school year.  (Id. at Ex. 2).  As Reilly handed the letter to Principal Kassees, Reilly explained that it contained her request for an extension of her DROP date.  (Id. at p. 99).  Without opening the letter, Principal Kassees said that Reilly would retire on her original DROP date (September 30, 2003).  (Id.).  When Reilly asked "why," Principal Kassees said, "You know why. It will remain as it was stated.  It's my call.  End of conversation." (Id.).[6][7]  Then, Reilly and her husband left the office.[8]

_____

46, Ex. 2, Reynolds Decl. at Exs. B-C).  Thus, viewing the facts in the light most favorable to Reilly, these criteria were pertinent to the determination of whether to extend her DROP service.

[6]   Mr. Reilly's version of this conversation essentially comports with Mrs. Reilly's. Mr. Reilly stated during his deposition that when his wife informed Principal Kassees of the contents of the letter, Principal Kassees picked up the envelope, did not open it and said, "No change."  (Doc. 46, Ex. 4, Eugene Reilly Dep. at 46).

[7]   Principal Kassees testified during her deposition that Eugene Reilly was present at the July 10, 2003 meeting, she reviewed the letter Reilly gave her during that meeting and that she simply told Reilly that Reilly was not going to be extended. (Doc. 54-3, Kassees Dep. at p. 74).  Principal Kassees also testified that she did not tell Reilly why she would not be extended nor did Reilly ask.  (Id.).

[8]   While Principal Kassees declined to extend Reilly's DROP service, she has recommended the extension of the DROP service for the other three employees who

-8-

Principal Kassees testified that while Reilly was an "excellent" counselor and excelled in one-on-one counseling, Reilly was not extended in DROP because "she'd (Reilly) been a difficult employee, like pushing the envelope.  And I did not have to reappoint her, have her come back, and so I chose not to." (Doc. 54-3, Kassees Dep. at pp. 41, 76).  Principal Kassees further testified that Reilly was difficult because of her "interactions with people in the building," when she presided over testing "it would be chaotic in the building," "there was always a crisis of some sort" on FCAT testing days, Reilly was unorganized during each of the three years she ran the FCAT testing, and that overall, there was a lot of "tension" and "drama" when Reilly was in the building.  (Id. at pp. 76-78, 87); (Doc. 46, Ex. 3, Kassees Decl. at ¶¶ 10-13, 17).

Principal Kassees elaborated on her criticisms of Reilly in her declaration recalling one specific incident where Reilly and Assistant Principal Bill Brantley were engaged in a shouting match that ended in Kassees' office and that both Reilly and Brantley were verbally disciplined; Principal Kassees added that it was her impression that Reilly was "overreacting." (Id. at Kassees Decl., ¶ 13).  Principal Kassees also recalled an incident where Reilly kicked a student in the foot following a

---

have requested such:  (1) Brenda Goodman (58 years old upon original application - science teacher whose DROP service has been extended twice); (2) Jeanette Constantini (56 years old upon original application - language arts teacher who was extended once and there is no evidence as to whether Constantini has been extended a second time); and (3) David Cail (61 years old upon original application - Spanish teacher whose extension is pending with the district).  (Doc. 46, Ex. 3, Kassees Decl. at ¶¶ 38-41).  As Reilly points out, all of these extensions (or requests) occurred after Principal Kassees denied hers.

parent/teacher conference and that, thereafter, Reilly told Principal Kassees that she kicked the child.  (Id. at ¶ 14); (Doc. 54-3, Kassees Dep. at p. 52).[9]

Principal Kassees asserts that Reilly "had trouble" running the guidance office smoothly because she could not effectively communicate with the guidance office personnel, namely Velda Woodard; Principal Kassees states that she even had to "take control" of the guidance office for a period of time.  (Doc. 46, Ex. 3, Kassees Decl. at ¶ 16).  However, Tom Mezzano (the head guidance counselor after Reilly) testified that he did not have the power to hire, fire, promote, write up or discipline the other guidance employees and that those functions rested solely with Principal Kassees.  (Doc. 54-6, Mezzano Dep. at pp. 18-19).  Likewise, Reilly testified that Principal Kassees was always "in charge" of the guidance department.  (Doc. 46, Ex. 1, Reilly Dep. at p. 60).

Principal Kassees also declares that Reilly was "overly harsh" with parents and that some parents refused to speak with Reilly.  (Doc. 46, Ex. 3, Kassees Decl. at ¶ 15).  Woodard states that "on more than one occasion" when parents came to the guidance office, they told Woodard that they did not want to speak with Reilly because she was rude.  (Doc. 46, Ex. 6, Woodard Decl. at ¶ 10).

---

[9]   Reilly denies that any such incident occurred.  (Doc. 46, Ex. 1, Reilly Dep. at p. 76).  However, Velda Woodard, a clerk in the guidance office, states in her declaration that Reilly kicked the student as Reilly walked by the student and then reacted angrily when the student said "you kicked me"; Woodard further declares that Reilly later told her that she kicked the student on purpose.  (Id. at Ex. 6, Woodard Decl. at ¶ 6).

Principal Kassees, however, also testified that Reilly met all of the criteria under the MOU, which provides that a principal "should" grant DROP extensions if an instructor meets the listed criteria.  Specifically, Principal Kassees agreed that Reilly was concerned with providing opportunities for the academic growth of the students, Reilly supported the overall mission of the school and that Reilly worked well with the students.  (Doc. 54-2, Kassees Dep. at pp. 88-90, 166-168; Doc. 54-4, Kassees Dep. at Ex. 7).

Although Principal Kassees says she disciplined Reilly verbally, she never documented any discipline in writing.  (Doc. 46, Ex. 3, Kassees Decl. at ¶ 18).  Further, Principal Kassees states the following are the reasons that she never gave Reilly a poor performance evaluation: (1) Reilly's problems were not related to counseling and, in her (Kassees') view, that was the focus of the evaluation; (2) Principal Kassees gave Reilly the "benefit of the doubt," as every time she verbally counseled Reilly, Reilly's performance would briefly improve; and (3) Principal Kassees did not see "any reason" to give Reilly an unsatisfactory evaluation so close to Reilly's retirement.  (Id.).  Principal Kassees states, however, that her evaluations of Reilly became less enthusiastic over the years as evidenced by the decreased amount of handwritten comments.[10]  (Id.).

_____

[10]   While Principal Kassees is indeed correct that she wrote fewer handwritten comments on Reilly's evaluations over time during Reilly's tenure at Fort Caroline, this is also true for Tom Mezzano, who, like Reilly, received exemplary evaluations from 2001 through 2004 (Mezzano assumed Reilly's duties as head guidance counselor when Jacqueline Byrne replaced Reilly).  (Doc. 54-6, Mezzano Dep. at Ex. 44).

-11-

A couple of days after the July 10, 2003 meeting in Principal Kassees' office, Reilly contacted the Duval County Teachers' Union (the "union") to determine "what [her] options were." (Doc. 46, Ex. 1, Reilly Dep. at pp. 104-105).  Reilly spoke with union representative Carol Buckman.  (Id.).  After Reilly explained the situation, Buckman called Principal Kassees (a conversation Principal Kassees claims never occurred).  (Id.; Doc. 46, Ex. 3, Kassees Decl. at ¶ 35).  The following week, Buckman contacted Reilly and told her that she had spoken to Principal Kassees and that Principal Kassees informed her that Reilly knew the reason her DROP service was not extended.  (Doc. 46, Ex. 1, Reilly Dep. at pp. 104-105).  Reilly was upset that Buckman called Principal Kassees and told Buckman "I didn't give you authority to call my principal.  This has nothing to do with my principal.  It has to do with the DROP program."  (Id. at p. 105).

Then, Reilly called Principal Kassees and apologized for the union contacting her.  (Id.).  Reilly testified that Kassees said, "Donna (Reilly), why don't you become the building rep for the union?".  (Id.).  Reilly explained that she only contacted the union to learn what her options were.  (Id. at p. 106).  Principal Kassees then reiterated that her DROP service would not be extended and told Reilly that Reilly was not coming back to Ft. Caroline for the rest of her (original) DROP period (which expired on September 30, 2003).  (Id.).  Principal Kassees denies that she spoke to any union representative and that she had that conversation with Reilly.  (Doc. 46, Ex. 3, Kassees Decl. at ¶¶ 35-36).

-12-

Later that same week, Reilly spoke with Dane Gilbert, the Director of Staffing for the district. (Doc. 46, Ex. 1, Reilly Dep. at pp. 107-108; Doc. 46, Ex. 12, Gilbert Decl. at ¶¶ 1, 10-12). According to Reilly, Gilbert told her that (1) he didn't know what was going on, (2) Principal Kassees had already hired another counselor, (3) Reilly could work as a counselor at Parkwood Heights Elementary School from the beginning of the school year until her DROP date (September 30, 2003) and (4) "I (Gilbert) don't know about you, but I wouldn't want to go someplace where I'm not wanted." (Doc. 46, Ex. 1, Reilly Dep. at pp. 107-108). Gilbert states that in his initial conversations with Reilly, he told her that it was within Principal Kassees' discretion whether to extend DROP service and that she (Reilly) could retire as planned and wait thirty days and re-apply to the district. (Doc. 46, Ex. 12, Gilbert Decl. at ¶¶ 10-11).

Meanwhile, Gilbert had spoken with Principal Kassees, who informed him in July 2003 that Fort Caroline needed a guidance counselor at the beginning of the 2003-2004 school year because Reilly was retiring in October (actually September) 2003. (Id. at ¶¶ 4-5). Gilbert did not think it unusual that Principal Kassees wanted the new counselor at the beginning of the school year, rather than in October, as most principals prefer to have personnel in place from the start of the school year and it can be difficult to find guidance counselors in October. (Id.).

After speaking with Principal Kassees, Gilbert learned that the district had two

guidance counselors with open contracts[11], one of whom was Jacqueline Byrne - the then twenty-five year old who ultimately replaced Reilly.  (Id. at ¶¶ 6-7).  Prior to July 2003, the district recruited Jacqueline Byrne at a recruiting fair in New York and offered her an open contract, which she promptly accepted.  (Id.).  Because Byrne has an open contract, Gilbert placed her at Fort Caroline because there was an opening.  (Id. at Gilbert Decl. at ¶¶ 8-9).  Then, Gilbert informed Principal Kassees that he had found a guidance counselor (Byrne) and that he encouraged Principal Kassees to call her.  (Id.).  Kassees testified that because Byrne was the name Gilbert gave her, that's who she "hired."  (Doc. 54-2, Kassees Dep. at p. 163).  Gilbert, Bennie Moore (the Middle School Staffing Supervisor) and Vicki Reynolds (the Chief Human Resource Officer for the Duval County School Board) assert that Principal Kassees did not have the power to "hire" Jacqueline Byrne at Fort Caroline for the 2003-2004 school year, and, instead Gilbert placed Byrne at Fort Caroline.  (Doc. 46, Ex. 2, Reynolds Decl. at ¶ 17; Ex. 12, Gilbert Decl. at ¶¶ 7, 9; Ex. 13, Moore Dep. at pp. 10-11).

After placing Byrne at Fort Caroline, Gilbert had another conversation with Reilly, during which he discussed the merits of Reilly transferring to Parkwood Heights

---

[11] An open contract occurs in situations where the school district recruits a candidate for an upcoming school year, offers the candidate a position in the district and the candidate accepts within a specified time frame; upon acceptance, the recruit is guaranteed a position with the district.  If there is no suitable position available at the beginning of the school year, the individual is paid a full salary and benefits and placed in surplus status until a vacancy arises.  This type of recruiting is normally reserved for "top candidates."  (Id. at ¶¶ 6-7).

for the remainder of her DROP service.  (Doc. 46, Ex. 12, Gilbert Decl. at ¶ 15).

Gilbert further asserts that it was during this conversation that he said something like

"I would want to go somewhere I was really wanted."  (Id.).  According to Gilbert,

Reilly agreed to take the position.  (Id.).  Gilbert told Bennie Moore to complete the

paperwork required to place Reilly at Parkwood Heights.  (Id. at ¶ 17; Ex. 13, Moore

Dep. at pp. 5-7).  The effective date of Reilly's transfer was August 1, 2003.  (Id. at p.

12).

On August 30, 2003, Reilly filed an internal EEO Complaint with the district's

Equal Opportunity/ Equal Access ("EQ/ EA") division alleging age discrimination and

discrimination based on "health.'  (Doc. 46, Ex. 1, Reilly Dep. at Ex. 3).  On March 12,

2004, Reilly filed a Charge of Discrimination with the Equal Employment Opportunity

Commission ("EEOC") alleging retaliation and discrimination based on age and

ERISA.  (Id. at Ex. 4).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "there is no genuine issue as to any

material fact" and "the moving party is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(c).  "The burden of demonstrating the satisfaction of this standard lies

with the movant, who must present pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, that establish the absence

of any genuine material, factual dispute."  Branche v. Airtran Airways, Inc., 342 F.3d

1248, 1252-53 (11th Cir. 2003) (internal quotations omitted).  An issue is genuine

when the evidence is such that a reasonable jury could return a verdict for the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250 (1986).  In determining whether summary judgment is appropriate, a court must draw inferences from the evidence in the light most favorable to the nonmovant and resolve all reasonable doubts in that party's favor.  Centurion Air Cargo, Inc. v. United Parcel Serv. Co., 420 F.3d 1146, 1149 (11th Cir. 2005).

## III.   DISCUSSION

### A.    Age Discrimination Under the ADEA and FCRA

In Counts I and II of the Verified Complaint, Reilly alleges that defendant discriminated against Reilly based on age under the ADEA and FCRA when Principal Kassees declined to extend Reilly's DROP date.  The parties agree that this is a circumstantial evidence case and that the familiar framework originally articulated in McDonnell Douglas Corp. v. Green, 93 S.Ct. 1817 (1973), applies.  The parties also agree that Reilly satisfies the required prima facie case for age discrimination under the ADEA and FCRA, namely that: (1) Reilly is a member of the protected age group, (2) Reilly was subject to an adverse employment action; (3) a substantially younger person filled Reilly's position; and (4) Reilly was qualified to perform the job for which she was rejected.  Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (citation omitted).

Because Reilly establishes the required prima facie case, an inference of discrimination arises and the burden shifts to defendant to respond with a legitimate,

nondiscriminatory reason for the challenged employment action.  Id.  If defendant

responds with such a reason, the presumption of discrimination disappears and Reilly

must come forward with evidence sufficient for a reasonable trier of fact to conclude

that the reason defendant gave was not the real reason, but a pretext for

discrimination.  Id. at 1024-25; Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir.

2002).[12]

     Here, viewing the facts in the light most favorable to Reilly (as is required at the

summary judgment phase), there is an issue of fact sufficient to preclude summary

judgment concerning whether Principal Kassees' proffered legitimate,

nondiscriminatory reasons for refusing to extend Reilly's DROP service are pretext

for age discrimination.  Principal Kassees' proffered reasons for refusing to extend

Reilly's DROP service are: (1) Reilly caused "drama" at Fort Caroline and generally

did not interact with people in the building well; (2) Reilly's administration of the FCAT

test was chaotic and unorganized; (3) Reilly kicked a student on one occasion and

even admitted such to Kassees; (4) Reilly did not run the guidance office smoothly;

and (5) Reilly was "overly harsh" with parents, who "on more than one occasion,"

expressed that they did not want to meet with Reilly.

_____

[12]    This same framework also applies to Reilly's age discrimination claim under the
FCRA (Count II) as the Florida Civil Rights Act of 1992 was patterned after the Civil
Rights Acts of 1964 and 1991 (Title VII) and the ADEA; thus, federal case law
interpreting Title VII and the ADEA are applicable to cases under the FCRA.  Brown
Distributing Co. Of West Palm Beach v. Marcell, 890 So. 2d 1227, 1230 n. 1 (Fla. 4th
DCA 2005); Fla. State Univ. v. Sondel, 685 So. 2d 923, 925 n. 1 (Fla. 1st DCA 1996).

However, the three employment evaluations that Principal Kassees performed for Reilly do not reflect any of these concerns.  Principal Kassees never marked Reilly as unsatisfactory in any performance criteria over a three year period (including "Shows sensitivity to student needs by maintaining a positive school environment," "Communicates with parents," "Promotes student growth and performance," "Demonstrates professional behaviors," "Demonstrates ability to communicate effectively with parents, students, teachers, and administrators"), and all written comments on Reilly's evaluations were positive (including "Communicates daily with parents," "Highly professional.  A valued member of the Ft. Caroline staff," "Mrs. Reilly is a top-notch test coordinator.  She supports Ft. Caroline as a valued team member").  Further, Principal Kassees never issued any written warning to Reilly in the three years Reilly served as the guidance counselor at Fort Caroline.

Principal Kassees explains that Reilly's positive performance evaluations were limited solely to Reilly's ability as a guidance counselor, as she was excellent in one on one sessions with students.  A review of the performance evaluations illustrate that a reasonable trier of fact could infer more was captured in those evaluations, including some of the criteria Principal Kassees now says were her reasons for not extending Reilly.

Further, viewing the facts in the light most favorable to Reilly, Principal Kassees' comments that "It's time for you to retire.  You need rest.  You've worked long enough.  Stay home and travel with Gene.  You've been working a long time.  It's

-18-

time for you to stay home...  Well, I'm concerned with your health," and Principal

Kassees' response of "Now" to Reilly's statement of "What about my health?  There's

nothing wrong with my health" (when coupled with the record evidence concerning

Reilly's job performance that conflicts with Principal Kassees' proffered reason for

refusing to extend Reilly's DROP service) constitute circumstantial evidence of age

discrimination sufficient to survive summary judgment.

Principal Kassees' corroboration from guidance employees Mary Turner, Velda

Woodard, Susan Hamner (a Vice Principal at Fort Caroline), Stephanie Stevenson (a

science teacher and Standards Coach at Fort Caroline), Jessica Killen (a language

arts teacher at Fort Caroline), Michael Jennings (a math teacher at Fort Caroline),

concerning Reilly's "chaotic" and "unorganized" administration of the FCAT

examination and Reilly's failure to relate to guidance employees and teachers does

not preclude a finding of a triable issue on the age discrimination claims.  In fact,

when viewed against Reilly's contrary testimony and that of Tom Mezzano (the

counselor who assumed the head guidance counselor role after Reilly's departure),

and Reilly's positive written evaluations, this differing testimony merely underscores

a factual dispute.

Moreover, Reilly relies on the Eleventh Circuit's recent unpublished decision in

Mock v. Bell Helicopter Textron, Inc., 2006 WL 2422835 (11th Cir. Aug. 23, 2006)[13],

---

[13]    While it is true that the Eleventh Circuit's unpublished opinions are not binding authority and that reliance upon them alone is ordinarily disfavored, they are nevertheless persuasive.  See 11th Cir. R. 36-2 and I.O.P. 6.

where the Court reversed an award of summary judgment to the defendant because it refused to provide the plaintiff therein a reason for his termination at the time of the termination, only to later explain that it was for poor performance.  Similar to <u>Mock</u>, Principal Kassees merely told Reilly that Reilly knew why her DROP was not being extended, that it was Kassees' call and that her decision was final; only later, in discovery during this suit, did Principal Kassees elaborate on the panoply of reasons that Reilly's DROP service was not extended.  Thus, while the Court is underwhelmed by plaintiff's case and makes no prediction as to how a jury will view it, there are sufficient factual disputes such that defendant's motion for summary judgment on the age discrimination claims in Counts I (ADEA) and II (FCRA) are due to be denied.

### B.    Retaliation

In Count II of the Verified Complaint, Reilly alleges retaliation under the FCRA. (Doc. 1, Verified Complaint, ¶¶ 26, 33).  Fla. Stat. § 760.10(7) provides:

> It is an unlawful employment practice for an employer...to discriminate against any person because that person has opposed any practice which is an unlawful employment practice under this section, or because that person has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this section.

Because the FCRA is modeled after its federal counterparts (Title VII and ADEA), <u>see</u> <u>Brown</u>, 890 So. 2d at 1230 n. 1, a plaintiff must establish a prima facie case of retaliation by showing evidence that: (1) she engaged in statutorily protected activity, (2) she was adversely affected by an employment decision and (3) there was a causal connection between the statutorily protected conduct and the adverse employment

action.  Drago v. Jenne, 453 F.3d 1301, 1307 (11th Cir. 2006).

To constitute an adverse employment action, a plaintiff must show "an employer's challenged action would have been material to a reasonable employee," which means that "it would likely have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Sante Fe Ry. Co. v. White, 126 S.Ct. 2405, 2410, 2415 (2006); see also Dar Dar v. Associated Outdoor Club, Inc., 2006 WL 3006704, *4 (11th Cir. Oct. 23, 2006) (unpublished opinion).  To satisfy the causal connection prong of a retaliation claim under the FCRA, a plaintiff must, at a minimum, establish that the defendant was aware of the protected expression at the time the defendant took the adverse employment action.  Russell v. KSL Hotel Corp., 887 So. 2d 372, 379 (Fla. 3rd DCA 2004) (citing Raney v. Vinson Guard Service, Inc., 120 F.3d 1192, 1196 (11th Cir. 1997)) (other citations omitted). "Moreover, while awareness of protected expression may be premised upon circumstantial evidence, the plaintiff must show a defendant's awareness with more evidence than mere curious timing coupled with speculative possibilities."  Id. (citing Raney, 120 F.3d at 1197).

Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to proffer a legitimate reason for the adverse employment action.  Id. Once that occurs, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the "legitimate reason" was merely pretext for the retaliatory act. Id. at 380 (citing Sierminski v. Transouth Financial Corp., 216 F.3d 945, 950 (11th Cir.

2000).

Here, defendant is correct that Reilly's original basis for retaliation, that defendant transferred Reilly to Parkwood Heights because she filed an internal EEO Complaint with the district's Equal Opportunity/ Equal Access ("EQ/ EA") division, set forth in paragraphs 26 and 33 of the Verified Complaint and in Reilly's March 12, 2004 EEOC Charge of Discrimination[14], fails because the required causal relationship is lacking.  Reilly's transfer was effective on August 1, 2003.  Reilly did not file any EEO complaint with the district until August 30, 2003.  Thus, the filing of the EEO Complaint cannot be the basis of any retaliatory action.

Reilly, however, shifts her retaliation theory mid-litigation, without seeking leave to amend her complaint or submitting an amended charge of discrimination, and asserts that the basis of the retaliatory discharge claim is her July 2003 telephone call to the union and the subsequent transfer.  Even assuming *arguendo* that Reilly can survive these procedural defects and establish that her lone telephone call to the union to determine her options under DROP qualifies as protected activity under the FCRA, Reilly's FCRA claim fails under the causal connection prong of the prima facie case for retaliation.

_____

[14] The March 12, 2004 Charge of Discrimination provides, in pertinent part, "I complained about Ms. Kassees' discriminatory remarks, to the Duval Public School EEO, and to the School board.  When Ms. Kassees learned that I had reported the matter, she told me 'You're not coming back here.'" Neither the Charge of Discrimination, nor the Verified Complaint, make any mention that Reilly complained of discrimination to the union and that Kassees or Dane Gilbert learned of such a complaint.

At no point does Reilly adduce evidence that Dane Gilbert was ever aware of her telephone call to the union.  Further, the record is clear that Gilbert, not Principal Kassees, had the authority and made the decision to transfer Reilly to Parkwood Heights for the remainder of her DROP service.   Gilbert determined to place Jacqueline Byrne at Fort Caroline at the beginning of the school year because of her open contract and the necessity to place a guidance counselor at the school in the beginning of the school year (August 2003), rather than in October 2003.  Gilbert also determined to move Reilly to Parkwood Heights effective August 1, 2003.  Thus, because Reilly has adduced no evidence that Gilbert knew of the union "complaint" between July 10, 2003 and August 1, 2003, Reilly fails as a matter of law to satisfy the causal connection prong of the prima facie case of retaliation as set forth in <u>Russell</u>. Further, any allegation that Principal Kassees and Gilbert colluded to reassign Reilly within that time frame is mere supposition and unsupported by the record.

## IV.    CONCLUSION

For the foregoing reasons, summary judgment is due to be denied on the ADEA and FCRA claims in Counts I and II of the Verified Complaint alleging age discrimination; however, summary judgment is appropriate on the retaliation claim under the FCRA alleged in Count II.  Accordingly, it is hereby **ORDERED**:

1.    Defendant Duval County Public Schools' Motion for Summary Judgment (Doc. 46) is **GRANTED IN PART AND DENIED IN PART**.

2.    Further, upon due consideration, Defendant Duval County Public

Schools' Daubert[15] Motion addressed to plaintiff's Vocational Evaluation Specialist, Jerry Albert (Doc. 47), is **DENIED**.


      **DONE AND ORDERED** at Jacksonville, Florida this <u>31st</u> day of October, 2006.


                                      **TIMOTHY J. CORRIGAN**

                                      United States District Judge

t
Copies: counsel of record

---

[15] <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).